# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-399V
### Filed: April 9, 2019
PUBLISHED

| | |
|---|---|
| JOANNA WEBER,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages;<br>Decision on the Written Record;<br>Influenza (Flu); Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Isaiah Richard Kalinowski, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.*
*Lara Ann Englund, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On March 21, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccination. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters and the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for a SIRVA. For the reasons discussed below, the

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

undersigned now awards compensation in the amount of $85,000.00 for past pain and suffering, and $1,027.83 for past unreimbursable medical expenses.

## I.      Procedural History

On March 21, 2017, petitioner filed a petition for compensation.  ECF No. 1.  On March 23, 2017, petitioner filed medical records (ECF No. 6) and a statement of completion on March 30, 2017.  ECF No. 8.  On May 2, 2017, petitioner filed an affidavit.  ECF Nos. 9.  Updated medical records were filed on June 8, 2017 (ECF No. 12), and July 20, 2017 (ECF No. 16), with an amended statement of completion filed on July 20, 2017.  ECF No. 17.

Respondent filed his Rule 4(c) report on March 27, 2018, in which he conceded that petitioner was entitled to compensation.  ECF No. 33.  On March 29, 2018, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for a SIRVA.  ECF No. 34.  The parties then began the process of negotiating the appropriate amount of damages.

On August 15, 2018, respondent filed a status report stating that an offer of damages was made on August 9, 2018, which petitioner did not accept.  ECF No. 39. On September 13, 2018, a scheduling order was issued.  ECF No. 41.  The scheduling order noted that the only issue in dispute was damages relating to pain and suffering. *Id.*  Petitioner filed a Motion for Finding of Fact Regarding Damages on September 14, 2018.  ECF No. 40.  Respondent filed Respondent's Brief on Damages on September 28, 2018, (ECF No. 42), and petitioner filed a reply on October 5, 2018.  ECF No. 43. This case is now ripe for a determination regarding petitioner's pain and suffering award.

## II.     Relevant Medical History

Petitioner received a flu vaccination on October 8, 2015 in her left shoulder.  Ex. 1 at 2.  Petitioner's prior history includes arthroscopic debridement and repair of her right shoulder labrum in April of 2013.  Ex. 2 at 1-4.

On October 27, 2015, petitioner saw Dr. Anthony Wallace, an orthopedist, complaining of left arm pain immediately following a flu shot.  Ex. 5 at 13.  At that time, petitioner stated her pain was "8/10 on the pain scale," occurred with overhead lifting, and that she experienced mild weakness.  *Id.*  However, an evaluation showed petitioner had a full range of motion and full strength at that time.  *Id.* at 15. Neer's maneuver and Hawkins maneuver were positive, but crossover test and O'Brien's test were negative.  *Id.*  Petitioner received a steroid injection at that time and Dr. Wallace noted "[c]onstellation of symptoms resembles impingement."  *Id.* at 15-16.  Imaging and non-steroidal anti-inflammatory drugs were avoided because petitioner may have been pregnant.  *Id.* at 16.  Dr. Wallace performed a subacromial injection.  *Id.* at 16.

Petitioner saw Dr. Mark Hines, a pain management specialist, due to right shoulder pain and right cervicalgia on December 29, 2015.  Ex. 2 at 1-4.  Petitioner reported that she began developing shoulder pain about 12-18 months earlier, and returned to physical therapy.  Petitioner did not mention left shoulder pain at that time.  *Id.*

Petitioner attended physical therapy for right neck and shoulder pain from December 31, 2015 through July 13, 2016.  Ex. 11 at 192, 395-98.

On January 11, 2016, petitioner returned to Dr. Wallace for left shoulder pain.  Petitioner reported that the steroid injection had provided some relief, but described her pain as 4-5 out of 10.  Ex. 5 at 8.  Petitioner also stated that the pain was worse with overhead activity and when lying directly on it, but it did "not really wake her from sleep."  *Id.*  Petitioner had a full range of motion and full strength at that time.  *Id.* at 11.  Further, Neer's maneuver and O'Brien's tests were positive, but Hawkins maneuver and crossover tests were negative.  *Id.*  An ultrasound was performed, which showed no partial or high-grade tearing of the rotator cuff tendon, normal glenohumeral and acromioclaviular joints, and negative dynamic impingement testing.  *Id.* at 12.  Dr. Wallace noted that it was possible the vaccine injection could have penetrated her subacromial space and caused an inflammatory reaction.  *Id.*

An MRI arthrogram of petitioner's left shoulder was performed on January 29, 2016.  Ex. 3 at 377.  The MRI showed mild degenerative arthrosis of the acromioclavicular joint with small superior sublabral recess, and a less likely small superior labral tear from anterior to posterior ("SLAP") lesion.  *Id.*

On February 3, 2016, petitioner saw Dr. Hines again for cervical dystonia, and complained of left lateral shoulder pain that began after her October 15 vaccination.  Ex. 2 at 5-6.  Petitioner reported that "she had pretty severe pain that she [felt] is more restrictive and internal and not necessarily superficial."  *Id.* at 5.  Dr. Hines noted that petitioner's left shoulder "is painful and she lacks internal rotation by about 15 degrees at 90 degrees of abduction."  *Id.*  Dr. Hines recommended physical therapy and dry needling.  *Id.* at 6.

Petitioner received dry needling in her left shoulder during two physical therapy visits that were intended to address pain in her previously injured right shoulder.  Ex. 11 at 218, 226.  At a February 3, 2016 physical therapy session, petitioner's therapist noted that petitioner received dry needling on her left shoulder muscles to help with the neck shoulder cervical rotation. This improved the left shoulder comfort but was "a secondary effect and not the focus of today's treatment." *Id.* at 227.  The therapist added that they were not getting full improvement of petitioner's neck dysfunction because of the "left shoulder inflammation and irritation that occurred with her left shoulder flu shot." *Id.*

On March 11, 2016, petitioner saw Dr. Martin for a follow-up for her left shoulder pain.  Ex. 5 at 3.  Petitioner reported that she continued to have mild to moderate pain that woke her from sleep if she rolled over onto it and pain with overhead activity.  *Id.*

3

An examination revealed petitioner had full range of motion and full strength on internal and external rotation. *Id.* at 6. Dr. Martin noted that petitioner may have a small SLAP tear, but that she did not want to undergo surgery due to the "significant difficulty postop with her rehabilitation and  pain in regard to the right [shoulder surgery]." *Id.* at 7. A left glenohumeral shoulder injection of lidocaine and Kenalog was performed on March 17, 2016, that resulted in "[i]mmediate improvement in pain and symptoms." *Id.* at 2.

On April 22, 2016, petitioner saw Catherine Norton, M.D., for a physical. Ex. 6 at 3-6. Petitioner's medical history included "Left shoulder labrum tear and impingement syndrome 2015." *Id.* at 3. However, there was no indication that she reported any pain, reduced strength, or reduced range of motion at that time. *Id.* at 3-6.

During a physical therapy session on May 25, 2016, petitioner underwent soft tissue manipulation of her left subscapularis, dry needling of her left anterior deltoid, and thermal treatment of her left bicep tendon. Ex. 11 at 352.

On May 31, 2016, petitioner saw Donald D'Alessandro, M.D., an orthopedist, for a follow-up regarding her right shoulder injury. Ex. 8 at 3-10. There was no indication that she reported any left shoulder pain, reduced strength, or reduced range of motion at that time. *Id.*

Petitioner returned to Dr. Hines for follow-up of her right shoulder pain on July 7, 2016. She reported that she was about 85-90% improved, but was concerned because her symptoms recurred when she stopped therapy. Ex. 9 at 2-4. Petitioner reported that her pain was not overwhelming, and at that time was reported as "1/10". *Id.* However, there was no indication that she reported any pain, reduced strength, or reduced range of motion of her left shoulder at that time. *Id.*

Petitioner gave birth to a baby girl on April 4, 2017. *See generally* Ex. 12. The admission information identifies Dr. Martin as a medical provider that she saw for unspecified "shoulder pain." *Id.* at 218.

Petitioner returned to Dr. Martin on February 20, 2018 for a follow-up for left shoulder pain. Ex. 13 at 3. Dr. Martin reported that petitioner "[b]ecame pregnant, and has not been to see me in approximately 1.5 years." *Id.* at 3. Petitioner also reported that the injection she received at her last visit in 2016 improved her symptoms, however they "[s]lowly recurred over time." *Id.* Petitioner had not done any physical therapy regarding her left shoulder, and she experienced pain with overhead activity that was "better with anti-inflammatories." *Id.* On examination, petitioner showed normal strength and full range of motion in forward flexion and external rotation, and no tenderness to palpation. Neer's maneuver, Hawkins maneuver, and crossover tests were positive, but O'Brien's test and empty can test were negative. *Id.* Petitioner was assessed with left shoulder impingement syndrome and it was recommended that she attend physical therapy as well as take 800 mg of ibuprofen three times a day. *Id.* Dr. Martin also stated petitioner should "[f]ollow-up if not improving, would perform

subacromial injection at that time." *Id.* There is no indication that petitioner pursued physical therapy or additional subacromial injections.

### III.    Affidavit Evidence

On July 5, 2018, petitioner filed an affidavit regarding pain and suffering. Ex. 15. Petitioner described how, prior to her vaccine-related injury, she was extremely active including exercising 4-5 times per week and taking walks with her two dogs. *Id.* at 1. Petitioner was dependent on her left arm due to a previous right shoulder injury. *Id.*

According to petitioner, the injury delayed recovery of her right shoulder. *Id.* at 2. Further, petitioner stated that her prior history of right shoulder pain "should be seen as an aggravating factor" because it "took out my one good arm, the one I had relied on and would be relying on as I continued to recover from my right shoulder surgery." *Id.* at 4-5.

The SIRVA also altered petitioner's physical activity. Petitioner could not exercise with the same frequency or intensity in the months after her injury. *Id.* at 3. The injury also negatively impacted her physical activities, such as swimming and bowling. *Id.* at 7. Petitioner stated she can no longer walk her dogs without her husband because she "cannot manage both on a leash if they decide to start pulling." *Id.* at 3.

Petitioner described how the injury effected her professional life as a nurse. Due to her SIRVA, petitioner claims she cannot physically move patients without assistance, making her less efficient and effective. *Id.* at 2.

Petitioner provided additional details regarding her treatments as well, explaining that she was unable to pursue aggressive treatment because she was pregnant. Further, petitioner did not "feel the need to return for follow-up visits simply to check in with [her] doctors, because, as a nurse practitioner, I have a sufficient knowledge of medicine to monitor my own status and progress." *Id.* at 5.

The SIRVA also impacted petitioner's personal life. Immediately following the injury, she was forced to rely on her husband to help with everyday tasks including showering, changing clothes, and transportation. Additionally, the injury caused significant anxiety because "[t]he prior shoulder injury on the other side had culminated in a disastrous surgery, and I was terrified that this new injury would result in the same level of trauma, disruption, and pain." *Id.* at 3. The injury also negatively effected caring for her newborn daughter due to weakness and pain in her shoulder. *Id.* at 5.

Regarding petitioner's current condition, she assessed herself at 65-75% of her prior capacity. Petitioner stated that she continues to have weakness and soreness in her left shoulder. Petitioner also described how she has difficulty with tasks such as physically interacting with her young child, managing her luggage when she travels, and moving patients in her capacity as a nurse. *Id.* at 2, 8. Petitioner also "cannot sleep on the side of [her] affected arm" due to pain. *Id.* at 3. Currently, petitioner is not

scheduling additional visits for her shoulder as she is "relying instead on [her] own base of knowledge as a treater." *Id.* at 8.

## IV.   Party Contentions

Petitioner requests $114,027.83 in compensation, consisting of $1,027.83 for past unreimbursable medical expenses and $113,000.00 for pain and suffering. Petitioner's Motion for Finding of Fact Regarding Damages ("Pet. Brief") at 1, 3. Petitioner represented that the unreimbursable medical expenses are not contested by respondent, and the only issue in dispute is that of pain and suffering. *Id.* at n.1. Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering.

Petitioner argues that she should be awarded $113,000.00 based on three years of ongoing symptoms and "the foreseeable future of residual effects over additional years (reduced to net present value)…." Pet. Brief at 3. Petitioner compares the instant case to *Derosiers*, in which damages were decided by the undersigned. *Id.* at 3-4. *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering). Petitioner notes that, like the petitioner in *Desrosiers*, petitioner was limited in her treatment options due to her pregnancy, and her injury was complicated by the need to care for a newborn. Unlike *Desrosiers*, petitioners' course of injury proved to be more severe. Petitioner asserts that she continues to suffer from adverse symptoms and underwent more aggressive treatment, including two steroid injections, prescriptions anti-inflammatories, and physical therapy visits that included dry needling. *Id.* at 3, 4.

Petitioner further argues that using her medical records and treatment regimen as the primary measure of pain and suffering is inadequate (and even inappropriate). Petitioner's counsel listed several factors that contributed to petitioner's inability to actively pursue treatment, including: family obligations pertaining to her ill father, the construction of her a new home, graduate school, IVF treatments, pregnancy, and caring for her newborn daughter. *Id*; Petitioner's Reply to Respondent's Response to the Motion for Finding of Fact Regarding Damages ("Pet. Reply") at 3.[3] Moreover, according to petitioner's counsel, the cessation of doctor visits "has no bearing on the level of suffering or emotional trauma [petitioner] has experienced." Pet. Brief at 3. Further, petitioner's counsel  asserts that petitioner conducted much of her rehabilitation for her left shoulder through self-guided exercises. Pet. Reply at 2.

Respondent argues that petitioner should be awarded $85,000.00 in compensation for pain and suffering. Respondent's Brief on Damages ("Res. Brief") at 1. Respondent notes that petitioner's medical records reflect a relatively minor injury with relatively little related treatment. Res. Brief at 6. Respondent references four total orthopedic visits for petitioner's left shoulder pain wherein petitioner's strength and range of motion was normal, two steroid injections that appeared to provide significant

---

[3] Petitioner's counsel failed to provide citations to the record for support of these points.

relief, and an MRI that showed only a possible SLAP tear and degenerative arthrosis. *Id.*  Respondent also noted that by February of 2018 petitioner reported that pain did not interfere with her sleep, and she exhibited no tenderness to palpitation.  *Id.* Moreover, while petitioner underwent extensive physical therapy for her pre-existing right shoulder and neck injury including dozens of sessions over seven months, only two included any treatment for her left shoulder.  *Id.*

Respondent contends that his position "is reasonable, especially in light of the seven publicly available pain and suffering award issued in SIRVA cases."  *Id.* at 7-8 (citing *Desrosiers*, 2017 WL 5507804 at *5; *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018); *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 at *7 (Fed. Cl. Spec. Mstr. May 23, 2018); *Kim v. HHS,* No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. Jul. 20, 2018).

Respondent argues that Desrosiers is distinguishable, because the amount awarded in that case (which is less than petitioner requests in this case) was based in significant part on extenuating circumstances related to that petitioner's pregnancy. Respondent contends that here, petitioner gave birth in April 2017, and there is no evidence that this affected her treatment in 2015 and early 2016, noting that petitioner received extensive treatment for her right shoulder injury in 2016.  Res. Brief at 7. Respondent also asserts that *Marino* is instructive here.  In that case, petitioner's shoulder injury interfered with her capacity to perform her job duties as a nurse practitioner and her ability to play tennis, resulting in the loss of petitioner's enjoyable physical activity and outlet for stress relief.  *Id.* at 7-8.

## V.    Discussion

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. HHS,* No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4] *I.D.*, 2013 WL

---

[4] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

2448125, at *9; *McAllister v. HHS*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995). Further, when an amount is awarded for "projected"—i.e., future— "pain and suffering," such amount must be adjusted to its "net present value." *Childers v. HHS*, No. 96-194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mst. Mar. 5, 1999) (citing Youngblood v. HHS, 32 F.3d 552 (Fed.Cir.1994)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[5] *Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *Graves v. HHS*, 109 Fed. Cl. 579 (2013). Instead, it is assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

In that regard, the undersigned notes that over the past four years the SPU has acquired significant experience regarding pain and suffering damages in SIRVA cases. In *Kim v. HHS*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. *Kim v. HHS*, No. 17-418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018). The undersigned noted that the median award for cases resolved via government proffer was $100,000.00 and the median award for cases resolved via stipulation by the parties was $71,355.26.[6] *Id.* The undersigned noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many

---

[5] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, which include the majority of SIRVA claims, have remained on the undersigned's docket.

[6] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. *Kim*, 2018 WL 3991022, at *6. Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id.* The undersigned noted that "These figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id.*

different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall *arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case.*" *Id.* at *9.

In their respective briefs, the parties compared the instant case to *Desrosier*, *Dhanoa*, *Marino*, *Knauss*, and *Kim*.  Additionally, since the inception of SPU in July 2014, there have been several reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.[7]  Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

## A. Determining Petitioner's Award of Pain and Suffering in This Case

Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer*, 1996 WL 147722 at *22-23.  Further, just as entitlement cannot be "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion" (§13(a)(1)), neither can pain and suffering  be based solely on the statements of petitioner.  Petitioner argues that "it is altogether improper to use medical records as the sole or even primary index of pain and suffering", and that the absence of specific references to symptoms within medical records are not "indicia to use as primary measurements of pain and suffering damages." Pet. Brief. at 5, 8.   However, contemporaneous medical records generally provide the most reliable supporting documentation of a medical condition and the effect it has on an individual's daily life.  *See Shapiro v. HHS.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections"), *citing United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *see also Cucuras v. HHS*, 993 F.2d 1525, 1528-29 (Fed. Cir. 1993) (noting that medical records are generally contemporaneous to the medical events recorded and are generally trustworthy records).  In this case, there are few medical records and few contemporaneous records, making evaluation of petitioner's pain and suffering challenging.

A petitioner who seeks more medical care has not necessarily experienced a greater degree of suffering and distress than a petitioner who seeks less care. Individuals have differing levels of pain tolerance and different thresholds for seeking medical treatment.  However, the undersigned is required to decide this case based on

---

[7] *See, e.g.*, *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017); *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018); *Collado v. HHS*, No. 17-225, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. Jun. 6, 2018); *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018); *Kim v. HHS,* No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. Jul. 20, 2018); *Dobbins v. HHS*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018); *Dirksen v. HHS*, No. 16-1461, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018); *Cooper v. HHS*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Nov. 7, 2018), *Knudson v. HHS*, No. 17-1004, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).

the evidence of record.  A petitioner who has sought more medical care will often have more contemporaneous medical records documenting his or her pain and limitations, which will assist the petitioner in demonstrating his or her level of pain and suffering and emotional distress.

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience in evaluating SIRVA claims, the undersigned finds that an award of $85,000.00 for petitioner's actual pain and suffering is appropriate in this case.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering. Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

### a. Severity of the Injury

Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, petitioner appears to have suffered a shoulder injury that was relatively mild.  That is, the available evidence demonstrates that petitioner's injury was not severe, and the period of her recovery was not prolonged.

With respect to the severity of petitioner's injury, her left shoulder was evaluated on four occasions.  On October 27, 2015, 19 days after her vaccination, petitioner reported left shoulder pain of 8 out of 10.  Ex. 5 at 13.  However, she also exhibited a full range of motion and strength at that time.  *Id.* at 15.  Petitioner's medical records do not reference left shoulder pain again until January 11, 2016 when she categorized her pain as 4-5 out of 10, but that it was not so severe as to "wake her from sleep."  *Id.* at 11.  Petitioner next reported pain on March 11, 2016, which she reported as mild to moderate, and that it woke her from sleep if she rolled onto her left shoulder.  *Id.* at 3. However, she continued to exhibit full range of motion and strength.  *Id.* at 6.

The last time petitioner sought care for her left shoulder was on February 20, 2018, almost two years after her vaccination.  At that time, petitioner reported that her symptoms improved after an injection in 2016, but that they had recurred over time.  Ex. 13 at 3.  Physical therapy was recommended, however there is no indication that petitioner pursued that course of treatment.

Additionally, between October 27, 2015 and February 20, 2018, there were multiple instances where petitioner sought medical care but the records do not mention

left shoulder pain.  *See, e.g.,* Ex. 2 at 1-4 (petitioner sought care for right shoulder pain and right cervicalgia but there is no mention of left shoulder pain); Ex. 6 at 3-6 (showing no mention of left shoulder pain during a physical examination by petitioner's primary care physician); Ex. 8 at 3-10 (failing to note any left shoulder pain during an orthopedic follow-up for right shoulder injury).

Further, diagnostic testing indicated that petitioner's SIRVA was not severe.   For example, additional testing performed at various times, including Neer's maneuver, Hawkins maneuver, the crossover test, and O'Brien's test, were inconsistently positive. Ex. 5 at 15 (indicating Neer's maneuver and Hawkins maneuver were positive, but crossover test and O'Brien's test were negative); Ex. 5 at 11 (indicating Neer's maneuver and O'Brien's tests were positive, but Hawkins maneuver and crossover tests were negative).  Moreover, petitioner's MRI from January 11, 2016 revealed only mild degenerative arthrosis with small superior sublabral recess and, less likely, a small SLAP lesion.  Ex. 3 at 277.

### b.  Duration of the Suffering

### i.  Past Pain and Suffering

Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, petitioner appears to have suffered a relatively mild shoulder injury.

As described above, petitioner initially presented with significant pain on October 27, 2015.  Ex. 5 at 13.  However, she also exhibited a full range of motion and strength at that time.  *Id.* at 15.  Thereafter, petitioner's shoulder pain was only documented intermittently, and she never described a significant amount of pain.  On January 11, 2016 petitioner categorized her pain as 4-5 out of 10, but that it was not so severe as to "really wake her from sleep."  *Id.* at 11.  On March 11, 2016, petitioner reported mild to moderate pain that woke her from sleep if she rolled onto her left shoulder and with overhead activity.  *Id.* at 3.  And on February 20, 2018, petitioner reported that her symptoms improved after an injection but recurred over time.  Ex. 13 at 3. However, at that time petitioner had not done any recent physical therapy, and apparently did not choose to partake in any additional physical therapy despite her physician's recommendation.  *Id.*

Petitioner did undergo certain testing and treatments for her shoulder pain, including an MRI, two cortisone injections, dry needling, and an at-home exercise program.  The records indicate these treatments were effective, and not significantly onerous.  For example, the cortisone injection on March 17, 2016 resulted in "[i]mmediate improvement in pain and symptoms."  Ex. 5 at 2.  And while petitioner's orthopedist considered her condition severe enough to recommend steroid injection

treatment, there is no indication that surgery was suggested.[8]  As a whole, the medical records suggest a fairly limited period of mild to moderate pain lasting approximately six months.[9]

Petitioner claims that she did not seek additional follow-up visits because "as a nurse practitioner, [she has] sufficient knowledge of medicine to monitor [her] own status and progress."  Ex. 15 at 5.  Petitioner also self-assesses her current condition at 65-75% of her prior capacity.  *Id.* at 8.  Petitioner's counsel provides additional reasons for why she did not actively pursue treatment for her injury, namely

> Her life was very busy and stressful: Her father was on life-support over a 6-month hospital stay (which required Petitioner to be present daily at the hospital), she and her husband were overseeing construction of their home, she was in graduate school full-time (located four hours away from home), and she was undergoing IVF treatments (which is time-intensive).  Then she was pregnant, had a baby, and her father died, so she had to deal with those affairs.

Reply Brief at 5-6.

Despite petitioner's affidavit, and petitioner's counsel's unsupported argument, the medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro*, 101 Fed. Cl. 532, at 537-38.  The paucity of relevant treatment records in this case leaves valuation of petitioner's pain and suffering challenging.  *See, e.g. Marino*, 2018 WL 2224736, at *8.  Moreover, for the reasons described above, notwithstanding petitioner's assertion that she pursued less than complete treatment of her injury, those records which do exist are not suggestive of a severe or prolonged injury.

The undersigned does note, however, that some additional (non-medical) mitigating factors are present in this case.  Petitioner described her physical difficulty caring for her child and working while experiencing her shoulder pain as well as the emotional toll of this added stress.  Ex. 15 at 6.  Petitioner also described how her injury has negatively impacted her ability to exercise as she once did.  *Id.* at 3, 7.  Additionally, petitioner has suggested in her affidavit that a previous injury to her right shoulder made her left SIRVA that much more onerous as she could not rely on a healthy shoulder to assist in her recovery.[10]

---

[8] Records indicate that petitioner did "not want to undergo another surgical procedure" as of January 29, 2016, but there is no indication that surgery was recommended or even considered.  Ex. 5 at 7.

[9] There were also multiple instances where petitioner's medical records do not include any reference to left shoulder pain.  See, e.g., Ex. 2 at 1-4; Ex. 8 at 3-10.

[10] Petitioner's affidavit also describes ongoing pain and limitations of her left shoulder that are specifically contradicted by contemporaneous medical records.  For example, petitioner claims that she cannot sleep

To the extent petitioner has averred that she has ongoing pain, weakness, and limited range of motion, this is not substantiated in the record of the case. As noted above, petitioner's most recent medical record does acknowledge "left shoulder pain". However, that record is more than a year old and also acknowledged that an injection in 2016 improved petitioner's symptoms. Ex. 13 at 2. Moreover, as of February 20, 2018, petitioner's orthopedist recommended only follow-up if not improving, and there is no evidence that petitioner ever returned or sought additional care elsewhere. *Id.*

The undersigned finds the *Marino* and *Desroisers* decisions to be helpful in determining the appropriate award for petitioner's past pain and suffering. Petitioners in both *Marino* and the present case reported significant pain at their initial medical evaluations. Ex. Ex. 5 at 13; *Marino*, 2018 WL 2224736, at *2-3. Like *Marino*, petitioner reported significant disruption of her employment duties and physically active lifestyle. Ex. 15; *Marino*, 2018 WL 2224736, at *4-5. Further, as in *Marino*, petitioner's busy work schedule, family obligations, and status as a nurse practitioner contributed to her lack of ongoing medical care. Ex. 15; *Marino*, 2018 WL 2224736, at *2-3.

Although petitioner in the instant case sought medical attention sooner and received additional treatment following her vaccination, the undersigned notes that the radiographic imaging in *Marino* revealed more significant shoulder pathology. Specifically, the April 2015 MRI in *Marino* revealed mild-to-moderate tendinosis and a tiny anterior peripheral leading edge bursal surface partial tear of the supraspinatus tendon. *Id.* at *2. By contrast, a January 11, 2016 MRI of petitioner's left shoulder in the current case revealed only mild degenerative arthrosis with small superior sublabral recess and, less likely, a small SLAP lesion. Ex. 3 at 277. In summary, the overall facts of both cases suggest a similar degree of shoulder impairment.

Further, like *Desroisers*, petitioner was limited in her treatment options due to her pregnancy, and her injury was complicated by the need to care for a newborn. 2017 WL 5507804, at *5. Petitioner's course of treatment was also more extensive that in *Desroisers*: here, petitioner underwent two steroid injections, prescriptions anti-inflammatories, and physical therapy visits that included dry needling. However, unlike the instant petitioner, the petitioner in *Desroisers* sought treatment on a more consistent basis, seeking treatment on 13 different occasions.[11] As described above, petitioner in this case sought care intermittently.

---

on her left side, and often awoke to searing pain from her shoulder injury. Ex. 15 at 3. However, her February 20, 2018 medical records specifically stated that her left shoulder pain "[d]oes not wake her from sleep at night." Ex. 13 at 2.

[11] As described in the decision awarding damages, the *Desroisers* petitioner first sought treatment for her shoulder injury on March 24, 2015, within two weeks of her March 9, 2015 vaccination. From that point forward, she sought treatment on March 30, April 9, April 16, April 21, April 23, April 28, May 5, May 14, June 1, July 7, August 3, September 21, and October 6. 2017 WL 5507804, at *1-4.

Based on all of the information above, the undersigned finds that an award of $85,000.00 is appropriate for petitioner's past pain and suffering.

## ii. Future Pain and Suffering

Petitioner argues in her brief that she will suffer pain and suffering and emotional distress as her residual symptoms persist.  Pet. Brief at 2, 3.[12]  However, the undersigned does not find preponderant evidence to support future damages.

In making this finding, the undersigned has considered petitioner's brief and affidavit.  As noted above, petitioner filed an affidavit dated approximately 36 months after her vaccination in which she reported that "[a]t this point, I rate myself at between 65% to 75% of my prior capacity for normal, day-today activities, and lower than that for specialized or strenuous movements."  Ex. 15 at 8.  Petitioner provided no additional evidence in support of her claim for future pain, suffering, and/or emotional distress.

The undersigned finds the affidavit to be inconsistent with the available medical evidence of record in this case.  This is significant because medical records are the most reliable evidence regarding a petitioner's medical condition.  *Shapiro*, 101 Fed. Cl. 532, 537-38.  Indeed, as described above, petitioner's medical records reflect improvement of her left shoulder condition with treatment.  For example, at an evaluation on February 20, 2018, petitioner had normal strength and range of motion.  Ex. 13 at 3.  Petitioner's physician recommended only 800 mg of ibuprofen thrice daily, physical therapy, and ordered petitioner to return only if she did not improve.  *Id.*  Petitioner admitted in her affidavit that she has not returned for a follow-up, and that she has not felt the need to schedule additional visits.  Ex. 15 at 8.  Moreover, the record does not reflect evidence of additional medical treatment for petitioner's left shoulder after February 20, 2018.  Taken together, petitioner's medical records and lack of ongoing treatment are inconsistent with the degree of symptoms alleged in petitioner's affidavit.

Petitioner asserts that her knowledge as a nurse practitioner providers her with sufficient knowledge of medicine to monitor her own status and progress.  Ex. 15 at 5.[13]  However, the undersigned does not find petitioner's position, or her self-assessment, to constitute preponderant evidence to support an award for future pain and suffering.  The undersigned notes that petitioner bears the burden of proof with respect to each

---

[12] Petitioner's Reply Brief does not appear to argue for future pain and suffering, as it requests that the Court make a factual finding for only pain and suffering that petitioner has already sustained.  See Pet. Reply at 6 (stating "Petitioner MOVES the Court to make Factual Findings that Petitioner *has sustained* pain and suffering damages amounting to $113,000.00 ….") emphasis added.

[13] Initially, there is no evidence that petitioner possesses additional training, certification, or expertise in orthopedic medicine.  Even if such evidence were furnished, the record does not contain medical records to evaluate the basis or supportability of her opinion.  There are no other statements or opinions from petitioner's medical providers to support an award of future pain and suffering.

element of compensation requested.  *Brewer*, 1996 WL 147722, at *22-23.  Based on the information above, the undersigned does not find preponderant evidence to support an award of future pain and suffering in this case.

## VI.    Conclusion

In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $85,000.00 in compensation for actual (or past) pain and suffering and $1,027.83 in compensation for past unreimbursable expenses.  The undersigned makes no award for projected pain and suffering, future medical expenses, or past or future lost wages.

Accordingly, **the undersigned awards petitioner a lump sum payment of $86,027.83, representing $85,000.00 in compensation for actual pain and suffering and $1,027.83 in compensation for past unreimbursable expenses, in the form of a check payable to petitioner, Joanna Weber.  This amount represents compensation for all damages that would be available under § 300aa-15(a).**

The clerk of the court is directed to enter judgment in accordance with this decision.[14]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.